UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Jacksonville Division

HANNAH PAGE, through her parent and
next friend SUMMER PAGE,

                Plaintiff,                Case No.: 3:09-CV-112-J-25-TEM

      vs.

SCHOOL BOARD OF NASSAU COUNTY,

                Defendant.
_____

## PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT
## AND ACCOMPANYING MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56 and Dkt. 74, Plaintiff Hannah Page ("Page") respectfully moves for final summary judgment, supported by a memorandum of law.

## PROCEDURAL HISTORY

Page, along with plaintiffs Gay Straight Alliance of Yulee High School ("YHS GSA") and Jacob Brock ("Brock"), filed their *Complaint and Demand for Injunctive Relief* on February 9, 2009 (Dkt. 1), alleging that Defendant School Board of Nassau County ("SBNC") violated the First Amendment and the Equal Access Act by denying them the right to form a GSA to fight anti-gay bullying at YHS during the 2008-09 school year. Plaintiffs sought injunctive relief and nominal damages arising out of the YHS claims.[1] Page also sought nominal damages for the unlawful denial of her right to

---

[1] It is undisputed that during the 2008-2009 school year, Page and Brock requested permission to form a GSA at YHS. Ex. O at ¶3; Ex. P at 38:18-39:14. The YHS principal granted their request, but Superintendent Ruis ordered the YHS principal to stop the GSA meetings after learning of the first meeting. Ex. P at 41:10-42:9, 43:2-5; Ex. G. at 27. After plaintiffs' counsel sent a letter to Ruis informing

form a GSA at Yulee Middle School ("YMS") on the same terms and conditions as other non-curriculum related student groups during the 2007-08 school year, her eighth grade year. Dkt. 1. Plaintiffs moved for a preliminary injunction on the YHS claims. Dkt. 2. In opposition, Defendant argued that the presence of a GSA, or at least a group using the *name* "Gay-Straight Alliance," would substantially and materially interfere with educational activities at YHS or endanger the well-being of YHS students. Defendant further argued, *inter alia*, that the GSA would interfere with the school district's abstinence-only education policy and might cause "harassment and safety problems," pointing to an incident at YMS when Page acted inappropriately after school officials cut short a gay-supportive event called the "Day of Silence." Dkt. 19 at 10.

On March 11, 2009, this Court entered a preliminary injunction, rejected Defendant's arguments, and found that "not a single case supports Defendant's position." *Id.* at 9. This Court ordered SBNC to grant access to the YHS GSA on the same terms and conditions as all other student organizations during the pendency of the lawsuit. *Id.* at 11. Thereafter, the parties stipulated to the entry of a permanent injunction on the same terms as those outlined in the Court's preliminary injunction, permanently establishing students' right to form a GSA at YHS and finally resolving all claims relating to YHS.[2] Defendant nevertheless disputes its liability arising out of its unequal treatment of the

---

him of the school district's obligations under the federal Equal Access Act and the First Amendment to allow access to the GSA, Dkt. 2-5, the Nassau County School District amended its policy on the formation of non-curricular clubs and suspended all clubs until they submitted required documents and obtained the SBNC's approval. Ex. P at 46:15-47:2, 48:17-19, 49:1-50:20. Thereafter, Ruis denied the GSA access to YHS, stating "[a] club name highlighting specific sexual orientations will not be permitted as it would violate school board policy." Dkt. 2-8; Ex. P at 52:6-10; Dkt. 10 at ¶9.

[2] Because Plaintiffs Brock and YHS GSA asserted only claims arising out of the unequal treatment of the YHS GSA during the 2008-09 school year, this stipulation ended their role as plaintiffs in the case.

proposed GSA at YMS during the 2007-08 school year, making the same or similar arguments this Court rejected in the Board's defense of its unequal treatment of the YHS GSA and despite its own admission that their YHS "arguments apply with equal force and effect" to the YMS claims. Dkt. 9 at 5 n.4. In addition, Defendant asserts that Page's inability to meet the unequal burden imposed on the GSA by her principal excused the School Board from its duties under the EAA and First Amendment. Following extensive discovery, the case is now ripe for summary adjudication.

## FACTS[3]

During the 2007-2008 school year, Page was an eighth grade student at YMS.[4] Ex. A at 16:6-9, 19:4-6, 22:5-7, 26:21-27:1; Ex. B at 17:20-24, 18:6-19; Ex. G. She was a good student, and was in the gifted program. Ex. C at 26:13-27:4; Ex. D at 37:24-38:4; Ex. E at 27:8-13; Ex. F at 12:6-9. Page was bullied and harassed at YMS during her sixth, seventh, and eighth grade years. Ex. A at 17:25-18:23, 22:8-25:13, 31:6-32:24; Ex. G at 12; Ex. K at ¶12; Ex. M at 15:25-16:7, 17:10-13; Ex. N at 20:2-9, 25:24-26:11, 31:11-32:12. The bullying ranged from being called names such as "ugly dyke" to having food thrown at her and being threatened with physical violence. Ex. A at 17:25-18:23, 22:8-25:13, 31:6-32:24, 42:9-43:7, 77:15-78:7; Ex. E at 6:10-12, 7:19-8:16; Ex. G at 12; Ex. N at 31:11-32:12. Page knew other students who were harassed because they were or were perceived to be gay, lesbian, bisexual, or transgender ("LGBT"). Ex. O at

---

[3] Plaintiff disputes many of the facts asserted by Defendant, and will, if necessary, present testimony at trial to present an accurate recitation of the facts. For purposes of this Motion for Summary Judgment, however, Plaintiff relies solely on the facts as Defendant alleges them and any testimony from Plaintiff's witnesses that is not contradicted by any testimony from Defendant's witnesses. These factual disputes are not, therefore, material to Page's claim of unequal treatment of the GSA.

¶2. *See also* Ex. C at 23:25-26:12; Ex. E at 55:19-21; Ex. G at 8; Dkt. 2-3 at ¶¶ 8-10, 12; Ex. L at 48:11-15.

During the 2007-2008 school year, in response to the ongoing bullying, Page sought permission from YMS principal, Dr. Deonia Simmons, to form a GSA at YMS.[5] Ex. A at 39:10-13, 47:21-48:3, 49:2-7; Ex. B at 10:20-24, 96:20-25, 101:15-24; Ex. E at 14:19-15:19, 45:1-19. She explained to Simmons that the purpose and mission of the GSA was to raise awareness about bullying and harassment of LGBT students and encourage tolerance and acceptance of all people.[6] Ex. A at 45:23-46:2, 49:2-7; Ex. B at 16:22-17:4, 104:9-1; Ex. E at 15:11-15; 5; Ex. O at ¶3. Simmons told Page that she had to find a YMS teacher who was willing to serve as faculty advisor for the GSA before he would consider her request.[7] Ex. A at 66:13-18; Ex. B at 101:23-24, 104:2-3, 108:8-10; Ex. E at 15:15-19. *See also* Ex. J (Nassau County School Board Policy 5.86 requiring that "[a]ll student organizations and student activities…be teacher-sponsored and approved by the principal," but not requiring students to identify or secure the club sponsor). Page sought a teacher to sponsor the GSA, Ex. A at 44:20-45:2, and, in the meantime, she held a GSA meeting off campus with her mother present and at least four students in addition to Page attended. *Id.* at 57:22-58:18, 60:15-62:5; Ex. N at 45:20-46:18, 47:14-18.

---

[4] YMS is a public secondary school located in Yulee, Florida and is operated by Defendant. Dkt. 8 at 40(a), 43(a). YMS receives federal financial assistance. Ex. H.

[5] As principal, Simmons was responsible for overseeing noncurriculum related student clubs. Ex. B at 13:23-14:24, 19:10-20:9; Ex. E at 34:8-9. This responsibility included approving and denying the formation of new clubs at YMS. Ex. B at 13:2-7, 13:23-14:24, 19:10-20:9, 108:21-25.

[6] Page intended the GSA to be a voluntary, unincorporated organization made up of students who attended YMS and for the club to be noncurricular and meet during non-instructional time. Ex. O at ¶4.

[7] At deposition, Superintendent Ruis, Defendant's designated witness for a 30(b)(6) deposition, ratified Simmons' actions on behalf of Defendant. Ex. P at 58:23-59:1. *See Topp, Inc. v. Uniden Am. Corp.*, No. 05-21698-CIV, 2007 WL 4218998 at *1 (S.D. Fla. Nov. 28, 2007)(The testimony of Defendant's Rule 30(b)(6) designee is "binding testimony.").

Sometime after his conversation with Page, Simmons heard from other faculty members that Page was having a difficult time finding a faculty sponsor. Ex. B at 111:15-112:5.[8] He made no effort to assist Page in finding a sponsor, and had no intention of finding a faculty sponsor for the GSA. *Id*. at 112:6-17. Yet, as principal of YMS, Simmons had previously sought out and appointed sponsors for other noncurriculum related student groups at YMS.[9] *Id*. at 63:15-64:4, 68:2-70:16. Simmons had even sought out a faculty advisor for a noncurriculum related group from a *different* school 1.5 miles away from YMS. *Id*. at 76-79. While Simmons had sought and appointed sponsors for other noncurriculum clubs who were not YMS faculty members, he did not give Page that option.[10] *Id*. at 38:25-40:20, 63:15-64:4, 68:2-70:16, 76:17-79:14, 76:9-80:5. *See also id*. at 76:9-80:5; 139:4-11 (YMS provides sponsors for each of the sporting activities without the students having to seek out and find their own sponsor).[11]

During the 2007-2008 school year, Defendant permitted various noncurriculum related student clubs to meet on school premises during noninstructional time. *Id*. at 24:4-15. These groups included: Campus Club, Science Literary Magazine, Fellowship of

---

[8] It would be no surprise if Page had a difficult time finding a faculty sponsor for the GSA. During the 2008-2009 school year at Yulee High School, Page and Brock asked several teachers to serve as a faculty sponsor of the YHS GSA before they were able to find a faculty member willing to sponsor the club. Two of the teachers Brock approached told him that they were unwilling to serve as a faculty advisor to the club because they did not want to jeopardize their jobs. Ex. G at ¶¶21-23; Ex. K at ¶¶21-22. Likewise, during deposition, some YMS faculty testified that they believe a GSA at YMS would be controversial. Ex. C at 19:12-19:25; Ex. F at 23:15-19, 25:15-25.

[9] Other faculty members also solicited fellow teachers for non-curricular clubs at YMS in the past. Ex. D at 7:12-16. For example, YMS teacher Jonathan Ball approached fellow teacher Andy Shepard and recruited him to co-sponsor the Fellowship of Christian Athletes. Ex. D at 7:12-16.

[10] Page's stepfather, Michael Luft, was a teacher at Yulee Elementary School during the 2001-2008 school year. Ex. A at 6:12-25; Ex. M at 6:10-12, 10:5-21. Summer Page, Hannah's mother, would have been willing to serve as a GSA advisor. Ex. Q at ¶2.

[11] The advisor for Youth Crime Watch was an employee of the Sheriff's Department. Ex. B at 39-40.

Christian Athletes ("FCA"), Youth Crime Watch, Yulee Academic Achievers, and Student Government Association ("SGA"). Defendant also allowed many noncurriculum related sports groups to meet at YMS, including basketball, football, track and field, volleyball, softball, soccer, and cheerleading. Ex. A at 27:4-11; Ex. B at 24:4-7, 37:11-38:17, 45:10-46:5, 52:7-53:2, 67:18-68:4, 75:10-76:19, 81:6-82:3, 89:24-90:19; Ex. D at 6:5-12, 7:9-11; Ex. F at 16:16-17:18; Ex. L at 6:22-24. These groups were permitted to meet on campus during noninstructional time, engage in activities, use school resources, and otherwise enjoy school privileges on school premises during that time. Ex. B at 24:4-7, 41:15-16, 46:22-48:23, 54:2-4, 86:13-17; Ex. D at 7:25-8:5; Ex. L at 9:19-10:12; Ex. G at 37. Neither the subject matter of the clubs nor the sporting activities are taught in any regularly scheduled class (some sports are played in gym class); they do not concern the body of courses as a whole or generate any academic credit and participation is not required for any class. Ex. B at 41:5-14, 46:22-48:23, 52:18-21, 53:16-20, 53:21-54:1, 71:22-72:9, 75:14-76:8, 80:19-81:5, 83:6-18, 90:14-91:21; Ex. D at 9:24-10:10; Ex. L at 14:8-17.

In addition to seeking approval to form the GSA, Page sought and obtained permission to hold a "Circle of Equality" – a gathering held before school where students sat in a circle to memorialize the bullying and harassment that LGBT students suffer in school.[12] Ex. A at 56:8-22, 63:5-11; Ex. B at 99:12-101:14, 116:11-117:17; Ex. E at 15:22-16:11, 28:17-29:10. No disruption occurred during or as a result of the Circle of Equality. Ex. A at 66:22-67:3; Ex. B at 117:18-21; Ex. E at 28:22-29:10, 30:3-8.

---

[12] At that point, Page had already held two Circle of Equality events in the school courtyard, without any disruption. Ex. A at 62:13-16.

Page also obtained Simmons' permission to hold the Day of Silence on April 25, 2008. Ex. A at 69:3-23; Ex. B at 118:23-119:13; Ex. E at 18:5-19:23, 45:10-19. Simmons granted Page permission to have the event, even though a Career Fair was scheduled for the same day. Ex. B at 131:22-132:2. The purpose of the Day of Silence was to remember "people who have been forced to be silent about the harassment and discrimination and bullying they have experienced, as well as the people who have died as a result of it" by remaining silent during the school day. Ex. A at 69:6-12. Several students participated on the Day of Silence. *Id.* at 81:18-82:1.

On the Day of Silence, a group of students came to school wearing t-shirts reading "God Made Adam and Eve not Adam and Steve." Ex. B at 124:2-22. Because the differing views caused some tension amongst students, Simmons ended the Day of Silence and ordered at least some students to remove their Day of Silence "paraphernalia" and t-shirts expressing a religious objection to homosexuality. *Id*. at 124:23-128:7, 136:19-137:9, 138:3-16.[13] Page was never told by the administration that the Day of Silence was canceled or that students were no longer allowed to participate in it, and was not even aware of it until she overheard a conversation amongst students during the Career Fair which was being held in the school cafeteria. Ex. O at ¶5.

_____

[13] Defendant has maintained throughout this litigation that the tension caused by the message of the Christian students was the sole prompt for it to end the Day of Silence. Dkt. 9 at 15; *see also* Dkt. 10 at ¶13. After over a year of discovery, Dr. Simmons, for the very first time, asserted at his deposition that he ended the Day of Silence as a result of threats of violence exchanged by students on both sides. Ex. B at 124-127, 133. Dr. Simmons admits, however, that he did not see any of these events personally. *Id*. at 125. He states that vice-principal Boatwright was the primary source of that information. *Id*. at 126. Yet, Boatwright testified in deposition that he was not at school on the Day of Silence and was not aware of any disruption other than the incident concerning Hannah that resulted in her being Baker Acted. Ex. E at 6:19-20, 46:3-24, 53:25-54:3-7, 55:13-15. Defendant has not come forward with a <u>single person</u> who witnessed any disruption at all caused by competing views on the Day of Silence, let alone any threats of violence.

While at the Career Fair, a staff member approached Page and a friend. Ex. A at 82:14-19, 89:13-91:17; Ex. B at 128:16-129:18; Ex. F at 45:3-13. The staff member told Page's friend she could not wear a bandana around her neck, which she was wearing in support of the Day of Silence; Page wrote a note in protest, and the staff member told Page she would not acknowledge her unless Page spoke verbally to her. Ex. A at 90:3-91:11; Ex. B at 129:2-13; Ex. F at 45:3-13. The incident upset Page, and she shouted a curse word, threw her bag down, and went to the office. Ex. A at 82:14-19, 89:13-91:23; Ex. B at 129:9-22; Ex. F at 45:3-13. While in the office, guidance counselor Lentz refused to allow Page to see her Summit Place counselor, Ms. Clark, and criticized Page for her behavior. Ex. A at 91:19-93:11. Page was very upset and she was put in a conference room in the office and left by herself. *Id.* at 95:2-8; Ex. B at 130:3-9. While in the conference room, Page cut herself with a razor blade that she had in her possession, to relieve stress. Ex. A at 91:24-98:12. Page was Baker Acted. *Id.* at 96:9-97:5; Ex. B at 130:15-24. Thereafter, Page was sent to SBNC's alternative school for the remainder of the school year. Ex. A at 98:4-9; Ex. B at 131:7-21; Ex. N at 63:15-65:5. Despite the tension caused by the expression of Christian sentiments on the Day of Silence, Defendant continues to allow FCA, a club based on Christianity and scripture, to meet.[14] Ex. D at 8:15-17; Ex. L at 9:19-10:8.

Simmons never approved Page's request to form a GSA at YMS. Ex. B at 107:23-108:12. Superintendent Ruis testified that he would not have permitted a GSA to

---

[14] The mission of the YMS FCA is "to present to athletes and coaches and all whom they influence the challenge and adventure of receiving Jesus Christ as Savior and Lord, serving Him in their relationships and in the fellowship of the church." Ex.V; *see also* Ex. L at 18:10-24; Ex. D at 13:23-14:4.

meet at YMS during the 2007-2008 school year; he would have denied any request to form such a club; and he would have put a stop to any GSA meeting that Principal Simmons would have allowed just as he did during the 2008-2009 school year at YHS. Ex. P at 53:23-54:11, 59:2-61:10. Whether or not Simmons explicitly denied Page's request to form a club is a disputed material fact; therefore, that issue is not appropriately resolved on summary judgment. The Court need not make that factual determination here and summary judgment is appropriate, however, because Defendant's unequal treatment of Page and the GSA constitutes a violation of the EAA and the First Amendment. Moreover, because the Superintendent would not have allowed a GSA in any event, going to the principal in the first instance was an exercise in futility. The policy of the Defendant was unequivocally expressed by the Superintendent – **no** GSA would be allowed in the Nassau County School District. Ex. P at 53-54, 59.

Defendant asserted that middle school students are "too young to be exposed to issues such as sexual orientations [*sic*] and preferences." Ex. P at 74:25-75:5. In Superintendent Ruis' opinion, that includes a middle school student "coming out of the closet." Ex. P at 83:17-84:9. Yet, Defendant admits YMS students already are exposed to issues related to sexual orientation. Defendant gives every YMS student a copy of the Nassau County Code of Student Conduct, which explicitly states that bullying based on sexual orientation is prohibited. Ex. P at 102:8-103:16; Exhibit T. In addition, during the 2007-2008 school year, there were LGBT students at YMS and students with openly gay parents. Ex. O at ¶6; Ex. P at 81:17-19. Defendant acknowledged that YMS students talk about current events in some of their classes, and that there are LGBT-related issues such

as same-sex marriage discussed in the news. Ex. P at 76:19-77:7, 77:8-10.  Further, the

FCA has existed at YMS for several years, and the national FCA has clearly articulated

views condemning homosexuality on its website, which is readily available to students.[15]

Ex. D at 9:7-16, 26:15-27:10; Ex. L at 10:9-12, 11:20-12:18, 37:5-18; Dkt. 14-2 at 115.

*See also* Dkt. 14-2 at 49, 115 (requiring FCA officers to sign a "Sexual Purity Statement"

agreeing to conform to Sexual Purity Policy which condemns "homosexuality."); Dkt.

14-2 at 195 (article in FCA magazine on "homosexuality in the locker room").  In

addition, during the 2007-2008 school year, other clubs engaged in activities that exposed

YMS students to issues beyond their maturity level. Ex. D at 18:13-22:8; Ex. F at 17:3-

10, 66:19-22); Ex. L at 26:9-32:18; Ex. P at 118:10-119:9.  Yet, Defendant allowed, and

continues to allow, those clubs to meet.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is

appropriate where "there is no genuine issue as to any material fact and … the moving

party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248, 250 (1986) (Material facts are those "facts that might affect the outcome

of the suit under the governing law.").  The moving party is entitled to summary

judgment if the nonmoving party fails to "make a sufficient showing on an essential

element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986) (quotations omitted).  Defendant bears the burden

---

[15] YMS FCA advisors deny any such discussions at YMS FCA meetings and deny having ever seen the FCA Playbook. Ex. D at 30:9-11; Ex. L at 37:19-38:5.  However, they freely admit that much of the language in the YMS FCA constitution which they submitted during the 2008-2009 school year is identical to language from the FCA Playbook. Ex. D at 31:1-35:9-20; Ex. L at 34:5-36:6.

of proof for its affirmative defenses, and summary judgment for Plaintiff is warranted if Defendant fails to present admissible evidence in support of its defenses. *In re Diagnostic Instrument Group*, Inc., 283 B.R. 87, 94 (M.D. Fla. 2002); *Bellsouth Advertising & Pub. Corp. v. American Business Lists, Inc.*, 1992 WL 338392, n. 5 (N.D. Ga.).

## ARGUMENT

I. **Both the First Amendment and the Equal Access Act Establish the Right to Form a GSA at YMS.**

A. **The Right to Form a GSA Under the First Amendment.**

The First Amendment provides that a governmental actor may not "abridg[e] the freedom of speech." U.S. Const. amend. I; *see also* U.S. Const. amend. XIV. This constitutional guarantee of free expression includes the constitutional guarantee of expressive association, *Healy v. James*, 408 U.S. 169, 181 (1972), and applies equally in the public school setting. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("It can hardly be argued that ... students ... shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."). Specifically, where public schools establish limited public forums by permitting noncurriculum related student groups to meet, students may exercise their constitutional right to expressive association to form a GSA. *Gonzalez v. Sch. Bd. of Okeechobee County*, 571 F. Supp.2d 1257 (S.D. Fla. 2008); *East High Sch. PRISM Club v. Seidel*, 95 F. Supp. 2d 1239 (D. Utah 2000). *See also Gay Lesbian Bisexual Alliance v. Pryor*, 110 F.3d 1543 (11th Cir. 1997).

A public school may deny access to a limited public forum to a noncurriculum related student group only where it can establish as an affirmative defense a

constitutionally sufficient justification for doing so – *i.e.*, (1) the student group will materially and substantially disrupt the operation of the school, or (2) the student group will materially and substantially harm the well-being, or otherwise invade the rights, of others. *Tinker*, 393 U.S. at 509, 513; *Gonzalez*, 571 F. Supp.2d at 1269. The school bears the burden of proof on these elements. *Tinker,* 393 U.S. at 509, 511; *see also Healy*, 408 U.S. at 184. The burden of proof cannot be met by mere "undifferentiated fear or apprehension." *Tinker*, 393 U.S. at 508. Rather, it can be met only by "a specific showing" based on actual "evidence."[16] *Id.* at 508, 509, 511; *see also Healy*, 408 U.S. at 184. The Nassau County School District cannot meet this burden.

### B. The Right to Form a GSA Under the Equal Access Act.

The federal Equal Access Act ("EAA") provides as follows:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a). In enacting the EAA, Congress effectively codified the First Amendment rights of noncurriculum related student groups.[17] It is therefore unsurprising that principles of EAA jurisprudence mirror principles of First Amendment jurisprudence. As with the First Amendment, under the EAA, "if a public secondary

---

[16] Defendant cannot meet its burden of proof by showing "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Gonzalez*, 571 F. Supp.2d at 1269, quoting *Tinker*, 393 U.S. at 509. *See also Texas v. Johnson*, 491 U.S. 397, 414 (1989). Thus, Defendant may not refuse to permit a GSA to meet merely because parents of students or other community members object.

[17] *See e.g., Bd. of Educ. of Westside Cmty. v. Mergens,* 496 U.S. 226, 239-40 (1980); *Prince v. Jacoby*, 303 F.3d 1074, 1090 (9th Cir. 2002).

school allows even one 'noncurriculum related student group' to meet…the school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional time." *Bd. of Educ. of Westside Cmty. Schools v. Mergens*, 496 U.S. 226, 236 (1990). This mandate of the EAA applies equally to a GSA.[18]

A school escapes liability for denying access to a student club only if it shows as an affirmative defense that the club would materially and substantially disrupt the operation of the school or harm the well-being of its students. 20 U.S.C. § 4071(f) & (c)(4); *see also Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 867 n.28 (2d Cir. 1996) (The material disruption and well-being exceptions set forth in "the *Tinker* line of cases is incorporated in subsection[ ] . . . 4071(f)."); *Boyd County*, 258 F. Supp. 2d at 690 (same). The school bears the burden of proof where it asserts the well-being exception. *Boyd County*, 258 F. Supp. 2d at 688; *Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1146 (C.D. Cal. 2000). The burden of proof cannot be met by "conclusory assertions." *Hsu*, 85 F.3d at 872. Rather, the school must show "documented instances" concerning the student group's "*own . . .* activities." *Boyd*

_____

[18] *See Straights & Gays for Equality v. Osseo Area Schs.-Dist. No. 279*, 471 F.3d 908 (8th Cir. 2006); *Gonzalez v. Sch. Bd. of Okeechobee County*, 571 F. Supp.2d 1257 (S.D. Fla. 2008); *White County High Sch. Peers Rising in Diverse Educ. v. White County Sch. Dist.*, 2006 WL 1991990 (N.D. Ga. 2006); *Boyd County High Sch. Gay Straight Alliance v. Board of Educ. of Boyd County*, 258 F. Supp. 2d 667 (E.D. Ky. 2003); *Franklin Cent. Gay/Straight Alliance v. Franklin Twp. Cmty. Sch. Corp.*, No. IP01-1518 C-M/S, 2002 WL 32097530 (S.D. Ind. Aug. 30, 2002); *Colin ex rel. Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135 (C.D. Cal. 2000); *East High Gay/Straight Alliance v. Board of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp. 2d 1166 (D. Utah 1999).Only one court has ever found that a school could permissibly ban a GSA. *But see Caudillo v. Lubbock Independent Sch. District*, 311 F. Supp.2d 550 (N.D. Tex. 2004)(school district could deny access to a GSA with the stated purpose of discussing sex at its meetings and promoting its website that provided access to obscene, indecent, and lewd sexual material, because those specific circumstances violated the school's abstinence-only policy and the state law criminalizing same-sex sexual relationships). None of the facts upon which the *Caudillo* court relied are present here, and same-sex relationships can no longer be criminalized. *Lawrence v. Texas*, 539 U.S. 558 (2003).

*County*, 258 F. Supp. 2d at 690, 691 (emphasis in original); *see also Clark v. Dallas Indep. Sch. Dist.,* 806 F. Supp. 116, 121 (N.D. Tex. 1992). Thus, Defendant cannot invoke the material disruption or well-being exceptions to justify YMS's unequal treatment of the YMS GSA absent evidence that the GSA Page was proposing acted in a way to materially disrupt the operation of the school or to threaten the well-being of students at YMS. *Gonzalez*, 571 F. Supp. 2d at 1265. There simply is no evidence here that would satisfy Defendant's burden.

## II. Plaintiff Has Established the Prima Facie Elements of First Amendment and EAA Violations. [19]

### A. YMS is a public secondary school that receives federal financial assistance.

The Equal Access Act defines a secondary school as "a public school which provides secondary education as determined by state law." 20 U.S.C. § 4072 (1). Florida law includes middle schools within its definition of those providing secondary education. § 1003.413(1), Fla. Stat. (2007)("Secondary schools are schools that primarily serve students in grades 6 through 12."). YMS, which serves students in grades six through eight, is thus a secondary school as defined by Florida law. It is, therefore, unsurprising that Defendant freely admits in its Answer that YMS is a public secondary school. Dkt. 8 at 40(a). Defendant also admits that YMS receives federal financial assistance. *Id*.

### B. Defendant permitted noncurriculum related student groups to meet at YMS during noninstructional time during the 2007-08 school year.

In *Mergens*, after a careful assessment of the statutory text and the legislative

---

[19] Additional unique elements of a First Amendment violation are also undisputedly met here: As principal, it was Simmons' responsibility to approve or deny school clubs. Ex. B at 13-14, 19-20, 108:21-25; Ex. E at 34:8-9. Defendant admits that Simmons conduct properly reflected and enforced official school board policy. Ex. P at 58:23-59. Defendant, and its agents, also acted under color of state law in its decisions regarding noncurriculum related clubs. *Id*.

history of the EAA, the Supreme Court concluded that the term "noncurriculum related student groups" "is best interpreted broadly" to include all student groups that do not satisfy one or more of following four criteria: (1) "the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course;" (2) "the subject matter of the group concerns the body of courses as a whole;" (3) "participation in the group is required for a particular course;" or (4) "participation in the group results in academic credit."  496 U.S. at 239-40.

Schools bear the burden of proving that recognized student groups are curricular. *Pope by Pope v. East Brunswick Bd. of Educ.*, 12 F.3d 1244, 1253 (3rd Cir. 1993).  In this regard, courts owe schools no particular deference.  *Mergens*, 496 U.S. at 245. "The court must examine the record of the student groups' actual activities as well as their stated purposes in order to make a qualitative determination as to curriculum-relatedness." *E. High Gay/Straight Alliance v. Bd. of Educ.*, 81 F. Supp.2d 1166, 1180 (D. Utah 1999).[20] In proving that the subject matter of a recognized student group in fact concerns the body of courses as a whole, a school must prove that it "has more than just a tangential or attenuated relationship to courses offered by the school."  *Mergens*, 496 U.S. at 238.

Accordingly, in *Mergens* the Supreme Court rejected the school's generalized arguments that its recognized student groups were curricular because they "further[ed] the School's overall goal of developing effective citizens by requiring student members to contribute to their fellow students" (student orientation club); "advance[d] the goals of the School's political science classes by providing an understanding and appreciation of

---

[20] *See also* 496 U.S. at 246 ("[O]ur definition of 'noncurriculum related student activities' looks to a school's actual practice rather than its stated policy.").

government processes" (student government clubs); "further[ed] one of the essential goals of the Physical Education Department – enabling students to develop lifelong recreational interests" (scuba diving club); "supplement[ed] math and science courses because [they] enhance[d] students' ability to engage in critical thought process" (chess club); and "promote[d] effective citizenship, a critical goal of the [school] curriculum, specifically the Social Studies Department" (community service clubs). *Id.* at 244.[21]

YMS has several noncurriculum related student groups that create a limited open forum and subject a school to the strictures of the EAA. Some of the noncurriculum related groups, clubs, organizations, and activities at YMS during the 2008-08 school year included the Fellowship of Christian Athletes, Cheerleaders, Youth Crime Watch, Student Government Association, basketball, football, track and field, volleyball, softball, soccer, Yulee Academic Achievers, and Campus Club. *See supra* at pp.5-6. All these student groups are noncurriculum related under *Mergens*: the subject matter of the group is not taught in any regularly scheduled class at YMS and no class was planned for the immediate future; the organizations did not address the school's curriculum as a whole; participation in the group was not required for any class; and no credit was given for participation. *See Mergens*, 496 U.S. at 239-40. Indeed, other courts have found that similar student groups qualify as noncurriculum related student groups. *See id*. at 246 (community service group); *Pope*, 12 F.3d at 1251-54 (community service group); *Straights and Gays for Equality (SAGE) v. Osseo Area Schools-District*, 471 F.3d 908, 911 (8th Cir. 2006)(cheerleading); *White County High School Peers Rising in Diverse*

---

[21] *See also Pope*, 12 F.3d at 1252.

*Education v. White County School District*, 2006 WL 1991990,*7 (N.D. Ga. 2006)(student council); *Boyd*, 258 F. Supp. 2d at 687 (executive council); *Garnett v. Renton School Dist.*, 772 F.Supp. 531, 534 (W.D. Wash. 1991)(sports teams), *rev'd on other grounds*, 987 F.2d 641 (9th Cir. 1993); *White County High School Peers Rising in Diverse Education v. White County School District*, 2006 WL 1991990 (N.D. Ga. 2006)(sports teams). The presence of these groups also creates a limited public forum for First Amendment purposes. *Gonzalez*, 571 F. Supp.2d at 1268-69. Thus, Defendant may not permissibly impose a condition on students wishing to form a GSA that it did not impose on other student organizations.

### C. Principal Simmons treated the GSA unequally by requiring Page to find a YMS teacher to serve as GSA faculty advisor before he would consider her request to form the GSA.

"[Defendant] … may not place restrictions on the GSA that are not uniformly applied to all noncurricular student groups. This finding is consistent with the holdings of other courts that have confronted claims by student organizations similar to the GSA for equal access and recognition as noncurricular student groups under the EAA." *Gonzalez*, 571 F. Supp.2d at 1267 (citations omitted). Principal Simmons denied equal access to Page and the GSA when he imposed the requirement that she secure a willing YMS teacher to serve as faculty advisor before he would consider her request to form a GSA at YMS. *See supra* at pp.4-5. Though Principal Simmons claimed this requirement was imposed equally on all noncurriculum related student groups, Simmons' own testimony

flatly contradicts this assertion.[22]

As set forth in the "Facts" section, *supra* at pp.5-6, during the 2007-2008 school year there were many noncurriculum related student groups that were allowed to meet at YMS. Most of these groups were not subjected to a requirement that the students in the group locate a willing YMS teacher to serve as faculty advisor before Simmons would consider the group's application. For those student organizations such as the SGA and various sports teams that school administration wished to encourage, Simmons and other faculty members secured a supportive faculty advisor for the group, and did not require students to secure a coach for any athletic team. *Id.* at p.5.

Some noncurriculum related student groups were not required to have faculty advisors who were YMS staff members <u>at all</u>. For example, when the YMS teacher who advised the YMS cheerleaders decided that she could no longer perform her duties, she suggested to Simmons that he replace her with an elementary school teacher from *another* Nassau County School District school. So, Simmons – instead of requiring the cheerleading students to find a willing YMS teacher to advise the group – appointed someone himself from outside the YMS faculty. *Id*. at p.5 and n.9. Similarly, when the volleyball team needed a coach, Simmons and the athletic director solicited a teacher from the Severely Emotionally Disturbed alternative school, located 1.5 miles from YMS, to serve as the team's advisor. *Id*. at p.5. One FCA advisor sought out another to serve in that role. *Id*. Finally, the advisor to the Youth Crime Watch was an employee

---

[22] The case law interpreting the EAA makes clear that courts should look to what clubs do rather than what they say they do when evaluating whether a student group qualifies as a non-curriculum related student group. Similarly, the Court should look to what Defendant actually does with regard to student groups rather than what it says it does as a general matter. *See supra* at pp.5-6.

of the Nassau County Sheriff's office and appointed by the school administration. *Id*. at n.11.

Simmons treated the GSA differently. He did not appoint a supportive faculty member to advise the GSA, even though he was aware that Page was having trouble finding one. *Id*. at p.5. Simmons did not give Page the option to find a GSA sponsor outside of YMS, even though other clubs were allowed to do so. *Id*.

In *Pope v. East Brunswick Bd. of Education*, the Third Circuit found that a school district violated the EAA when it treated a student-initiated Bible Club differently from the many other noncurriculum related clubs that had been initiated by faculty at the school. It said:

> [A] limitation to student-initiated groups defeats the broader purpose of the statute. A school with many faculty-initiated student groups can largely preempt demand for student-initiated groups. The result could be an open forum for mainstream interests and views, all sponsored by the faculty, with minority views excluded because of faculty hostility or indifference.

12 F.3d at 1250. The Court recognized that once the EAA has been triggered, then school administration must treat student initiated clubs equally with school or faculty initiated clubs. *Id*. Here, a requirement that the GSA, a group espousing a minority viewpoint, locate a faculty advisor from the pool of hostile or indifferent YMS teachers before its application could even be considered is far more burdensome than the requirement imposed on YMS' preferred school-initiated organizations. This inequality

of treatment alone violates the EAA.[23]  It is irrelevant whether Simmons intended to treat the GSA unequally or whether he bore any anti-gay animus when he did so.[24]  The test for unequal treatment is an objective one: if Dr. Simmons imposed a requirement on the GSA that was not imposed on other groups, he violated the EAA.[25]  *See Prince*, 303 F.3d at 1080.

Given that Plaintiff has established a *prima facie* violation of the EAA and the First Amendment, Defendant can only escape its obligation of equal treatment if it can prove as an affirmative defense that a GSA at YMS would materially and substantially disrupt the operation of the school, or harm the well-being, or otherwise invade the rights, of others.  *Tinker*, 393 U.S. at 509, 513; *Gonzalez*, 571 F. Supp.2d at 1262.

Perhaps the *Colin* court said it best:

> The Board Members may be uncomfortable about students discussing sexual orientation and how all students need to accept each other, whether gay or straight. ... [But] Defendants cannot censor the students' speech to

---

[23] Even if Simmons' allowance of a "Circle of Equality" could be construed as permission for the GSA to meet unofficially until Page could find a faculty advisor, *see* Ex. B at 117-118, this does not mitigate the EAA violation.  The *Pope* court held:

> The fact that the Bible Club at East Brunswick High School was permitted to meet unofficially-while being denied the use of the public address system, bulletin boards and other privileges accorded to nonreligious groups-is legally irrelevant. The same situation presented itself in *Mergens*, in which the Court held that the defendant school district violated the Act by not affording equal access.

12 F.3d at 1248 n.4.  Similarly, here, allowing Page to meet unofficially or informally while imposing an unequal faculty advisor requirement in order to gain official recognition would still violate the EAA.

[24] Though unnecessary to show here, anti-gay animus on the part of Defendant is clear: Dr. Ruis stated at deposition that Defendant would never have allowed the GSA to meet at YMS even if Page had found an advisor.  Ex. P at 53:23-54:11, 59:2-61:10.  This is reinforced by the fact that Defendant has spent considerable time and expense litigating to keep the GSA out of Yulee High School and changing its clubs policies.

[25] While Dr. Simmons allowed Hannah to meet when she called her group the "Circle of Equality" or the "Day of Silence," he erected a roadblock in her path when she proposed an official noncurricular club called "Gay Straight Alliance." Ex. A at 45:23-46:2; Ex. O at ¶3.  This is the same strategy employed by Dr. Ruis when he attempted to block the YHS GSA if the club's name had the word "gay" in it.  Dkt. 10 at ¶9.

avoid discussions on campus that cause them discomfort or represent an unpopular viewpoint. In order to comply with the Equal Access Act, … the members of the Gay-Straight Alliance must be permitted access to the school campus in the same way that the District provides access to all clubs, including the Christian Club and the Red Cross/Key Club.

*Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d at 1148. *See also Boyd County,* 258 F. Supp. 2d at 685-86 (where students protested gay rights group on campus with school boycotts, walk-outs, and protests outside the school, disruption caused by the protesting students did not justify denying access to the GSA). Those holdings and principles control here and none of the School Board's asserted rationales are a sufficient affirmative defense. *See* Ex. U.

Defendant's claim that a GSA would endanger the well-being of students and disrupt educational activities if the club did not have a faculty advisor because the students would be unsupervised is at best circular. Defendant could, of course, have eliminated the risk of unsupervised students meeting at YMS if it had treated the GSA the same way it treated other noncurriculum student groups by seeking out and appointing a faculty advisor, from inside the school or from the local community, as it did for other "preferred" student groups.

Defendant's next attempted justification of its unequal treatment of the GSA based on its version of events on the Day of Silence in April 2008 at YMS – after the unequal treatment already had occurred – also fails. Ex. U at ¶¶13, 16. Several students participated in the Day of Silence by pledging to remain silent for one day to raise awareness of anti-gay bullying. *Supra* at p.7. This Court has already expressly rejected Defendant's asserted rationale based on well-established case law and the facts of this

case. In its Order Granting Preliminary Injunction, this Court held:

> [T]he Court notes that case law does not support Defendant's point. In *Boyd County High School Gay Straight Alliance v. Board of Educ. of Boyd County, KY*, the school district also argued that the Alliance could be banned as disruptive. In that case, students protesting the existence of the gay rights group organized school boycotts, walkouts, and protests outside the school. The school district argued that the upheaval caused by the protesting students justified the exclusion of the group but the court rejected this argument citing the prohibition against a "heckler's veto." *Boyd County High School Gay Straight Alliance v. Board of Educ. of Boyd County, KY*, 258 F.Supp.2d 667, 688-691 (E.D.Ky.2003).
>
> FN8. Of note, it appears that Plaintiff Page's "outburst" was the direct result of the middle school illegally granting a heckler's veto by prematurely ending the gay rights demonstration.

Dkt. 19 at 9 n.8. Nothing has changed from the time of the preliminary injunction that would compel this Court to reach a different result.

When Defendant acted consistently with students' First Amendment rights, no disruption occurred: the Circle of Equality events caused no disruption. *Supra* at p.6 and n.12. Also, Defendant continues to allow groups expressing Christian viewpoints to meet at YMS despite the tension that Christian views caused on the Day of Silence, and admits that it would never have allowed Page to form a GSA, regardless of any disruption (or lack thereof). *Id.* at pp.8-9.

Moreover, Defendant offers no evidence to support its claim that "the presence of a club based upon sexual orientation or attraction in the middle school could potentially expose students to issues and concepts that they are not yet ready to deal with at their age and maturity level." Ex. U at ¶¶13, 16. In *Gillman v. Sch. Bd. of Holmes County*, *Fla.*, the court rejected the argument that gay-supportive student advocacy in a school containing middle school students was inappropriate for that age group. 567 F.Supp.2d

1359, 1374-75 (N.D. Fla. 2008). Here, the evidence confirms that ending bullying based on sexual orientation is appropriate for middle school students in general, and for Hannah Page in particular. Numerous studies confirm that anti-gay bullying is associated with higher truancy, lower grades, and student suicide. *Id*. at 1371. It is undisputed that Page, a good student in the gifted program, and other students, faced anti-gay bullying and harassment at YMS; school officials instead *punished* Page when she responded to this bullying with a curse word, suspending her for a full day from school. *See supra* 8; Ex. E at 6:10-12, 7:19-8:16, Ex. A at 42:9-43:7, 77:15-78:7. The alternative to inappropriate profanity is to combat bullying through civic engagement in the form of a GSA.

Further, addressing bullying against LGBT students at YMS is mandated by school board policy and by the YMS Code of Student Conduct. The YMS Code of Conduct prohibits bullying based on sexual orientation and specifies enhanced sanctions for bullying and harassment. Ex. P at 102-104. Surely YMS students subject to enhanced punishment for engaging in violent anti-gay bullying are sufficiently mature to discuss the issue and try to stop that bullying.

Additionally, discussions about gay people are appropriate at the middle school level because there were openly gay students at YMS during the 2007-08 school year and YMS students with gay parents. *Supra* at p.9. Middle school students discuss current events in class, and given the increase in issues related to LGBT people in the news it is plausible that LGBT related issues would find their way into current event discussions at YMS. *Id.* at pp.9-10. To suggest that talking about gay people is inappropriate denies the reality of YMS students' lives and sends a message to LGBT students that they

should be ashamed of who they are.[26]

Lastly, Defendant asserts that "a club related to sexual attraction and/or sexual orientation would conflict with the State of Florida's and SBNC's abstinence policy of not encouraging sex whether that be homo-sexual [*sic*] or hetero-sexual [*sic*] sex." Exhibit U at ¶13 &16.  Not only has Defendant failed to present a scintilla of evidence to support this assertion, this Court has already categorically rejected that argument.  *See* Dkt. 19 at 7-8.  *See also Gonzalez*, 571 F. Supp.2d at 1263-67; *Colin*, 83 F. Supp. 2d at 1144-1148.  Thus, the School Board has presented no viable affirmative defenses to Plaintiff's claims, and Plaintiff is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this honorable Court enter summary judgment in Plaintiff's favor and award her nominal damages and such other relief as the Court deems appropriate.

Respectfully Submitted,

*/s/ Shelbi D. Day*

SHELBI D. DAY, ESQ.
Trial Counsel
Fla. Bar. 0603201
SDay@aclufl.org
American Civil Liberties Union Foundation of Florida
P.O. Box 18245
Tampa, Florida 33679-8245
TEL: (813) 254-3361
FAX: (813) 254-0926

---

[26] Defendant admittedly allows existing student groups to hold games nights where students play video games that are rated "M" for mature audiences, takes students to college campuses, and affiliates with a national office that openly and explicitly opposes homosexuality. *See supra* at p.10. Defendant's own conduct belies its asserted justification.

RANDALL C. MARSHALL, ESQ.
Fla. Bar No.: 0181765
RMarshall@aclufl.org
MARIA KAYANAN, ESQ.
Fla. Bar No.: 305601
MKayanan@aclufl.org
American Civil Liberties Union Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, Florida 33137
TEL: (786) 363-2713
FAX: (786) 363-1392

ROBERT F. ROSENWALD, JR., ESQ.
Fla. Bar No.: 0190039
RRosenwald@aclufl.org


*Attorneys for Plaintiffs*


## Certificate of Service

I hereby certify that on March 18, 2010, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either by transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


*/s/ Maria Kayanan*
Counsel for Plaintiffs

**SERVICE LIST**
**Gay Straight Alliance of Yulee High Sch. *et al* vs. Sch. Bd. of Nassau County**
**Case No.: 3:09-CV-112-J-25-TEM**
**United States District Court, Middle District of Florida**

Francis Henry Sheppard, Esq.
Ryan Lukson, Esq.
Rumberger Kirk & Caldwell
PO Box 1873
Orlando, Florida 32802-1873
TEL: (407) 872-7300
FAX: (407) 835-2041
E-Mail: fsheppard@rumberger.com; rlukson@rumberger.com

Attorneys for Defendant School Board of Nassau County